JAMES McNAIR THOMPSON
SBN 67807
LAW OFFICES OF JAMES McNAIR THOMPSON
PO BOX 636
LOS GATOS CA 95031
(408) 358-6047
Attorney for Tracy Ann Valenzuela

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF CALIFORNIA,<br><br>    Plaintiff,<br><br>    vs.<br><br>TRACY ANN VALENZUELA<br><br>    Defendant | Case No.: CR 11 – 00471 DLJ<br><br>EXHIBIT 2 PART 2 (pp 14 – 26) TO DECLARATION OF JAMES McNAIR THOMPSON:  AFFIDAVIT IN SUPPORT OF SEARCH WARRANT |

believed that any of those modifications resulted in material differences in functionality however, as the attack patterns remained largely unchanged, with only minor differences in packet payload.

37. The LOIC application was designed to run in a Windows operating system (XP, Vista, Windows 7, etc). Its code was written in the C-Sharp language, or more commonly referred to simply as C#. C# is a language written and published by Microsoft, and is commonly available to developers. C# is an internationally known computer language used to create custom applications for Windows-based systems, the most popular computer operating system in the world.

38. In his report, ▇▇▇ stated LOIC was initially written as a network stress testing application, requiring the user to enter details on the types of requests they wished to send and the target host (referred to as manual mode). LOIC was subsequently modified to allow control by remote, which attackers frequently referred to as a "hive" or "hive mind" mode. ▇▇▇ further indicated, neither mode can be initiated and an attack launched by merely starting the application. They both require some level of interaction from the user, whether to enter target details in manual mode, or to direct the application to its remote control server.

39. According to ▇▇▇ a web-based LOIC tool was also created, however it offers no automatic remote control capability. It does not require the user to install an application and is usable in any JavaScript-compatible browser, so users on non-Windows systems (Mac, Linux, etc) are able to launch attacks with it. It has been seen with default settings pointed to https://www.paypal.com, however it still requires a user to consciously launch the attack.

## PayPal Logs

40. On December 15, 2010, ▇▇▇▇ PayPal, provided SA Adam Reynolds a USB thumb drive containing logs and reports detailing information regarding approximately 1,000 IP addresses that sent malicious network packets to PayPal during the Denial of Service attack. The 1,000 IP addresses was derived from logs created by a PayPal owned Radware device. According to ▇▇▇▇ this list represents the IP addresses that sent the largest number of packets.

41. Radware is a network utility device that was connected to PayPal's network and designed to provide security and detect known intrusion attacks. The Radware device is designed to examine all network traffic and determine which traffic to allow into the network. Legitimate traffic is allowed to enter the internal network and traffic that appears to be malicious is blocked before it enters the internal network. The device works by recognizing specific signatures of known network attacks. If a malicious attack is recognized, the device first blocks the traffic and then creates a record in a log file detailing the attackers IP address and the malicious signature recognized. The Radware device is designed to place priority on blocking the malicious attack instead of creating the record in the log file. Therefore, if the PayPal network was heavily attacked, the device might not log the malicious attack but instead, focus its resources on blocking the attack. Also, according to ▇▇▇▇ the Radware device rarely recognizes legitimate network traffic as malicious traffic. This means it would be highly unlikely that the Radware device would confuse someone who is trying to use PayPal services legitimately, with someone who is attacking PayPal. And, in this particular instance, due to the specific known signatures used by the LOIC tool, there is a greater degree of certainty that the malicious traffic was accurately identified.

TV000026

42. According to ▓▓▓, all of the attacks observed by eBay and PayPal engineers were using a specific set of strings, of which only a half dozen variants were observed, and were largely consistent across the source addresses observed for a given timespan of the attack period. This pattern suggests that attackers were either actively allowing their clients to be remotely controlled with universally-applied parameters, or were intentionally placing this configuration into the application when directed to do so.

43. ▓▓▓ also indicated that multiple string patterns were observed attacking PayPal systems simultaneously at various points throughout the attack period. This indicates that either multiple hive controls were in use, or LOIC users were not following consistent instructions, however all patterns still fell within the same list of variants. The use of so few attack strings also suggests a clear intent to attack PayPal systems, since those strings could not be obtained without knowing the purpose behind them.

44. The LOIC tools used to execute this attack contained the following specific PayPal-known signatures: wikileaks, wikileakshttp, goof, goofhttp, block-https-ascii, and goodnight.

### An IP Address Captured by PayPal is Linked to the Subject Premises

45. The IP address 99.191.75.211 was identified by PayPal in the 1,000 IP addresses report as sending approximately 520 malicious network packets to PayPal between December 9, 2010 at 11:48 Pacific Standard Time (PST) and December 9, 2010 at 12:39 PST. The 520 malicious network packets contained the known LOIC signature "goofhttp."

46. On December 29, 2010 a Federal Grand Jury Subpoena was served on AT&T Internet Services questing subscriber information for IP address 99.191.75.211 on December 9, 2010 at 11:48.

47. On January 05, 2011, a response was received from AT&T Internet Services. A review of the results revealed the subscriber to the IP address as Tracy Valenzuela with a service address of ▇▇▇▇▇▇▇▇▇, Napa, California, 94558. According to the subpoena results, the IP address was assigned to Valenzuela between December 9, 2010 and December 11, 2010.

48. On January 17, 2011, FBI Special Agent (SA) Ann A. Trombetta conducted a records search for Tracy Valenzuela of Napa, California via LexisNexis Accurint, a subscription based public and proprietary records database that can be accessed and searched over the Internet. Accurint reported information for one individual as residing at ▇▇▇▇▇▇▇ ▇▇▇ Napa, California, 94558: Tracy Ann Valenzuela, aka, Tracy Ann Larson, approximate age 42.

49. Based on my training and experience and knowledge of the LOIC application's functionality, the FBI has a high level of certainty that the attack signatures seen were a result of intentional and willful abuse, and not as a result of accidentally running the program without understanding what was happening. The forensic data collected also establishes a clear pattern of attack traffic over time, showing in many cases a prolonged intent to cause damage to PayPal systems.

## BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND E-MAIL

50. The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

TV000028

51. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and knowledge, I know the following:

a. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information;

b. **Internet Service Providers ("ISPs")**: Most individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").

c. With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods;

d. **Internet Protocol Address ("IP address")**: An Internet Protocol address is a unique numeric address used to identify computers on the Internet. The standard format for IP addressing consists of four numbers between 0 and 255 separated by dots (e.g., 149.101.10.40). Every computer connected to the Internet (or group of computers using the same account to access the Internet) must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. Internet service providers ("ISPs") assign IP addresses to their customers' computers. An ISP might assign a

17

different IP address to a customer each time the customer makes an Internet connection (so-called "dynamic IP addressing"), or it might assign an IP address to a customer permanently or for a fixed period of time (so-called "static IP addressing"). The IP address used by a computer attached to the Internet is unique for the duration of a particular session; that is, from connection to disconnection. ISP's typically log their customers' connections, which means that the ISP can identify which of their customers was assigned a specific IP address during a particular session.

e. E-mail is a popular form of transmitting messages and/or files in an electronic environment between computer users. A server is a computer that is attached to a dedicated network and serves many users. An e-mail server may allow users to post and read messages and to communicate via electronic means. When an individual computer user sends e-mail, it is initiated at the user's computer, transmitted to the subscriber's mail server, then transmitted to its final destination;

f. Any e-mail that is sent to a subscriber is stored in the subscriber's "mail box" on the provider's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by the e-mail provider. If the message is not deleted by the subscriber, the account is below the maximum limit, and the subscriber accesses the account periodically, that message can remain on the provider's servers indefinitely;

g. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to the servers of the e-mail provider, and then transmitted to its end destination. Users have the option of saving a copy of the

e-mail sent. Unless the user specifically deletes the e-mail from the e-mail account, the e-mail can remain on the system indefinitely. The sender can delete the stored e-mail message thereby eliminating it from the e-mail box maintained at the e-mail provider, but that message will remain in the recipient's e-mail box unless the recipient deletes it as well or unless the recipient's account is subject to account size limitations;

h. A subscriber can store files, including e-mails and image files, on servers maintained and/or owned by the e-mail provider; and

i. E-mails and image files stored on a e-mail provider server by a subscriber may not necessarily be located in the subscriber's home computer. The subscriber may store e-mails and/or other files on the provider's server for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her residence. A search of the files in the computer in the subscriber's residence will not necessarily uncover the files that the subscriber has stored on the e-mail provider's server.

j. Data that is processed by a computer may be written to the computer's internal hard drive or other storage medium even if the user does not intentionally save the information. Other storage medium may include compact discs (CDs), digital video disks (DVDs), floppy diskettes, thumb drives, pocket hard drives, external hard drives and flash drives. For example, a computer operating system may take random data out of working memory and use it to "pad" files on a computer hard drive during the storage process.

k. Electronic information can remain on computer storage media, such as internal

19

and external hard drives, pocket drives, thumb drives, CDs, DVDs, diskettes, and flash drives, for an indefinite period of time. Even when a computer user attempts to delete records from a computer storage medium, the records may still exist and be recovered through computer forensic techniques.

l.  Computer files may be easily moved from computer to computer, using direct wire connections or through the use of storage media such as floppy diskettes, CDs, DVDs, diskettes, thumb drives, pocket drives, flash drives and USB drives.

## SEARCH AND SEIZURE PROCEDURES PERTAINING TO COMPUTERS

52.  Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that during the search of premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.  Searching computer systems for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, it may be possible for the search team to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials

that may be commingled with criminal evidence. For example, the search team may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant. Similarly, the search team may be able to locate the materials covered in the warrant by looking for particular directory or file names. In other cases, however, such techniques may not yield the evidence described in the warrant. Computer users can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require the search team to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant.

c. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

d. The volume of data stored on many computer systems and storage devices will

typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

e. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard" is necessary to decrypt the data into readable form. Computer users also can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file, which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

TV000034

53. The procedures listed below, also contained in Attachment C to this affidavit, will be followed in executing this search warrant.

   a. In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

   b. If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

   c. In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

   d. When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the

TV000035

device or conduct an off-site forensic review of a device.

e. When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

f. Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

g. The time periods set forth in this protocol may be extended by court order for good cause.

h. In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

i. For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

TV000036

## CONCLUSION

54.     Based upon the information above, I have probable cause to believe that evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 1030(a)(5)(A)(Knowing Causing the Transmission Of A Program, Information, Code Or Command and Intentionally Causing Damage To A Protected Computer) exists at the SUBJECT PREMISES.

## REQUEST FOR SEALING

55.     Since this investigation is continuing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure of the search warrant at this time would seriously jeopardize the investigation; as such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue his flight from prosecution. Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of application for search warrant, the application for search warrant, and all attachments thereto be filed under seal until further order of this Court.

Ann A. Trombetta, Special Agent
Federal Bureau of Investigation

Sworn to before me this
26 day of January 2011

HONORABLE HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE