JAMES McNAIR THOMPSON
SBN 67807
NANCY A. THOMPSON
SBN 67809
PO BOX 636
LOS GATOS CA 95031
(408) 358-6047
Attorneys for Tracy Ann Valenzuela

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF CALIFORNIA, | ) Case No.: CR 11 – 00471 DLJ |
| Plaintiff, | ) DEFENDANT VALENZUELA'S ) MOTION FOR DISCOVERY OF ) INFORMANTS AND DISCOVERY OF ) EXPERT OPINIONS |
| vs. | ) |
| TRACY ANN VALENZUELA | ) DATE: January 3, 2013 ) TIME: 10:00 a.m. |
| Defendant | ) DEPT: Courtroom 7, 4th Floor |

TO THE CLERK OF THE ABOVE-ENTITLED COURT, AND TO THE

PARTIES TO THE ABOVE – CAPTIONED ACTION:  PLEASE TAKE NOTICE

THAT ON January 3, 2013, AT 10 a.m.,  the defendant herein, Tracy Ann

Valenzuela will move the court, and hereby does move the court, for an order that

the defendant be provided with discovery of the identity of any informants who have

provided the government with information about an alleged organization named

"Anonymous," with a written summary of any testimony that the government

intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during

its case-in-chief at trial, and with a copy of that certain thumb drive more

particularly described below.

Dated:  December 4, 2012

Respectfully submitted,

James McNair Thompson

Attorney for defendant Tracy Ann Valenzuela

## POINTS & AUTHORITIES

## I.  INTRODUCTION

### A.  "ANONYMOUS" AND THE INDICTMENT

The indictment in this cases alleges, "In retribution for PayPal's termination of WikiLeaks' donation account, Anonymous co-ordinated and executed DDoS attacks against PayPal's computer servers using LOIC. Anonymous referred to these co-ordinated attacks on PayPal as "Operation Avenge Assange."  Indictment Paragraph 7, incorporated by reference in Count 1, the conspiracy charge, in Paragraph 8, and in Count 14, the substantive count against defendant Valenzuela, in Paragraph 22.

Defendant is informed and believes that no such organization exists.

Therefore, defendant concludes that the government could only seek to establish the existence of this non—existent organization through the use of informants claiming to "belong" to "Anonymous" or through the use of experts claiming to have formed an opinion that "Anonymous" exists.

## B. THE NON – EXISTENCE OF "ANONYMOUS"

Defendant Valenzuela's computer is alleged to have contacted PayPal's servers beginning December 9, 2010 at 11:48 a.m. Pacific Standard Time (PST) to December 9, 2010 at 12:39 p.m. PST.[1]

On that very day, Adrian Chen posted "The Top Three Myths About Anonymous" on the web site "Gawker."  The top myth was that "Anonymous is a powerful hacking organization."

> This random 22-year-old British kid named Chris "Coldblood" Wood has been making the media rounds throughout Operation Payback, portraying himself as a "spokesman" for Anonymous on British and Canadian television. This has been met with howls from many Anonymous partisans. There is no Anonymous spokesman because Anonymous is highly decentralized and ephemeral; any leadership is informal, and coordination is on-the-fly. Anonymous is not, as USA Today calls it , "an organization working with Operation Payback." ***Think of Anonymous more as a subversive brand than an established crime syndicate.***
> Some take the Anonymous brand more seriously than others— Anonymous' years-long war on Scientology is waged by hardcore volunteers, for example—but anyone can act in the name of Anonymous, from a kid hacking into Sarah Palin's email account, to a bunch of 4chan users taking down the blogging platform Tumblr or sending Justin Bieber to North Korea. ***All you need to do is come up with a cool name for your campaign, Photoshop a flier, slap on Anonymous' creepy headless suit logo and start doing something disruptive. Anonymous is a mob, not The Mob.***
> http://gawker.com/5710948/the-top-three-myths-about-anonymous emphasis added.

University of London anthropologist David Graeber illustrated the difference between a traditional political organization and modern political action in a discussion of "Food Not Bombs:"

> A typical example is the story of Food Not Bombs, a group originally founded by a few friends from Boston who had been part of an affinity group providing food during the actions at Shoreham.  In the early

---

[1] See Doc 283, page 4, paragraph 45.

1980s veterans of the affinity group set up shop in a squatted house in Boston and began dumpster – diving fresh produce cast off by supermarkets and restaurants, and preparing free vegetarian meals to distribute in public places.   After a few years, one of the founding members moved to San Francisco and set up a similar operation there. Word spread (in part because of some dramatic, televised arrests) and, by the mid – 1990s autonomous chapters of FNB were appearing all over America, and Canada as well.  By the turn of the millennium, there were literally hundreds.   But Food Not Bombs is not an organization.  ***There is no overarching structure, no membership or annual meetings.  It's just an idea*** – that food should go to those that need it, and in a way that those fed can themselves become part of the process if they want to – plus some basic how – to information (now easily available on the Internet), and a shared commitment to egalitarian decision – making and a do – it – yourself (DIY) spirit. David Graeber *Direct Action, an Ethnography* AK Press 2009, page 236, emphasis added.

Understanding "Anonymous" as an idea makes the allegation of the indictment that an idea "co‑ordinated and executed" anything meaningless.

To understand this, one need only consider the aftermath of the 2012 World Series.  After the Giants won the series in the 10th inning of game 4, there were some disturbances in the streets of San Francisco.

San Francisco Giants fans celebrated the team's World Series win with a massive open‑air party near City Hall Sunday night. However, small groups of onlookers went on the rampage early Monday morning, lighting a bus on fire, throwing bottles and injuring several people.

More than 10,000 people were estimated to have gathered to watch Sunday night's game on giant screens set up in the city's Civic Center area. The fans erupted into a gleeful throng after the Giant's won in a rare World Series sweep. Fireworks went off across the city, horns honked and people poured into the streets to celebrate.

Most went home within an hour or so. However several small groups left the area and began to create havoc around the city's main thoroughfare, Market Street, in the Mission neighborhood and near AT&T Park where the Giants play. Several fires were set in the middle of streets and photos and videos of a city bus burning were posted on Twitter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Police scanners described a group of as many as 100 rioters setting fires, smashing windows, throwing bottles at police and damaging cars. By 2:30 a.m. police were reporting that the rioters had scattered, and city crews were cleaning up the burned material and broken glass from the streets so that they could be reopened in time for the morning rush hour.
http://www.usatoday.com/story/news/2012/10/29/san-francisco-riot/1665303/

## C.  THE SIGNIFICANCE OF THE NON— EXISTENCE OF "ANONYMOUS"

Nobody would take seriously an allegation that "In celebration of a World Series Victory, Giants Fans 'co-ordinated and executed' acts of vandalism in the streets of San Francisco."  Nobody would find credible a claim that a vandal   and a jaywalker were co—conspirators because each was engaged in a celebration "co-ordinated and executed" by Giants Fans.

The defendants are accused of conspiring with each other for performing an act which is connected only by an idea; without the fictional "Anonymous," nothing suggests that these acts were "co-ordinated" by anyone or anything.

There appears to be no evidence that defendant Valenzuela communicated with any other defendant, knew any other defendant, or acted in concert with any other defendant.  Only the existence of Anonymous as something more than a brand or an idea makes Count 1 viable.

## II.  REQUEST FOR EXPERT OPINIONS

Fed. R. Crim. P. Rule 16(a)(1)(G) provides, "At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702,[2] 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."

---

[2] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1)

1       Crim. L. R. 16 – 1(b) provides, "In the absence of a stipulation by the parties,

2  a schedule for disclosure of information as required by FRCrimP 16 or any other

3  applicable rule, statute or case authority may be set sua sponte by the assigned

4  Judge or Magistrate Judge. If a party has conferred with opposing counsel as

5  required by Crim. L.R. 16-1(a), the party may make a motion pursuant to Crim.

6  L.R. 47-1 and 47-2 to impose a schedule for such disclosure."

7       On July 22, 2011, defendant made a discovery request through her counsel

8  which included, "Please disclose any evidence which the government may present at

9  trial under Rules 702, 703, or 705 of the Federal Rules of Evidence by providing a

10  written report prepared and signed by the witness that includes a complete

11  statement of all opinions."  On September 25, 2012, she renewed and clarified this

12  request by letter from her counsel which said

> 13       I renew my request of July 22, 2011 for "any evidence which the
> 14  government may present at trial under Rules 702, 703, or 705 of the
>      Federal Rules of Evidence by providing a written report prepared and
> 15  signed by the witness that includes a complete statement of all
>      opinions to be expressed and the basis and reasons therefor, the data
> 16  or other information relied upon in forming such opinions, and the
>      qualifications of the witness. Rule 16(a)(1)(E)."  This would include not
> 17  only technical opinions on the operation of computers and the internet,
>      but **_also any expert opinion which you may seek to introduce on the_**
> 18  **_nature, structure, history or operations of Anonymous._** (Emphasis
>      added)

19

20       Defendant now asks for an order compelling the government to disclose any

21  such opinions, the basis and reasons therefor, the data or other information relied

22  upon in forming such opinions, and the qualifications of the witness.

23

24  the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable
    principles and methods, and (3) the witness has applied the principles and methods reliably to the
25  facts of the case."

### III.  DISCLOSURE OF ANY INFORMANTS

### A.  THE DUTY OF DISCLOSURE –
### INFORMANT DISCLOSURE AS *BRADY*
### MATERIAL

The burden is on the prosecution to prove that something called Anonymous exists, and that it exists in a form capable of co-ordinating and executing a Distributed Denial of Services attack.

If the government intends to attempt meet its burden by use of expert testimony, and if that proposed expert testimony is based in whole or in part on statements by informants or cooperating witnesses, then the credibility of those informants or cooperating witnesses bears directly on the credibility of the expert.

In *Brady v. Maryland*, 373 U.S. 83 (1963) the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  *See Giqlio v. United States*, 405 U.S. 150,  (1972); *United States v. McCrane*, 527 F.2d 906 (3d Cir. 1975), *aff'd after remand*, 547 F.2d 205 (1976).  The Supreme Court has also emphasized that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *United States v. Bagley*, 87 L.Ed.2d 481, 490 (1985).  Such evidence, if disclosed and used effectively, may make the difference between conviction and acquittal.  *See Napue v. Illinois*, 360 U.S. 264 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

## B.  ANY INFORMANT CLAIMING TO SPEAK FOR OR HAVE KNOWLEDGE ABOUT ANY ORGANIZATION CALLED "ANONYMOUS" WOULD LEAD TO EVIDENCE UNDERMINING THOSE CLAIMS

In acknowledging that the prosecution has a duty to disclose any favorable evidence that could be used at trial, it is frequently overlooked that the prosecution also has a duty to disclose any favorable evidence that could be used "in obtaining further evidence." *Giles v. Marvland*, 386 U.S. 66, 74 (1967).  Additionally, favorable evidence need not be competent evidence or evidence admissible at trial.  *United States v. Gleason*, 265 F. Supp. 850, 886 (S.D.N.Y. 1967); *Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th Cir. 1981)(evidence suppressed was material to the preparation of petitioner's defense, regardless whether it was intended to be admitted into evidence).

Clearly, the absence of anything called "Anonymous" is central to one of defendant Valenzuela's defenses, and disclosure of anyone who claims to have information that "Anonymous" exists as more than an idea will assist in the preparation of her defense.

## C.  TIMING OF DISCLOSURE

The Supreme Court has never precisely pinpointed the time at which the disclosure under *Brady* must be made.  It is abundantly clear, however, that disclosure by the government,

> must be made at such a time as to allow the defense to use favorable material effectively in the *preparation* and presentation of its case, even if satisfaction of this criteria requires pre-trial disclosure.*United States v. Pollock*, 534 F.2d 964, 973 (D.C. 1976).  *Accord United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988).

Manifestly a more lenient disclosure burden on the government would drain *Brady* of all vitality.   *United States v. Elmore*, 423 F.2d 775, 779 (5th Cir. 1970).

In *Harris v. Nelson* (1969) 394 U.S. 286, at 299-300, the Court was reviewing the question whether the Federal Rules of Civil Procedure applied to *habeas* petitions.  While ruling that the Rules did not apply, the Court found that a court had the inherent power to authorize such discovery mechanisms as were necessary to the discharge of justice.

> But with respect to methods for securing facts where necessary to accomplish the objective of the proceedings Congress has been largely silent. Clearly, in these circumstances, the habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage. Where their duties require it, this is the inescapable obligation of the courts. Their authority is expressly confirmed in the All Writs Act, 28 U.S.C. 1651. This statute has served since its inclusion, in substance, in the original Judiciary Act as a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of law.'" *Price v. Johnston*, 334 U.S. 266, 282 (1948), quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942). It has been recognized that the courts may rely upon this statute in issuing orders appropriate to assist them in conducting factual inquiries. *American Lithographic Co. v. Werckmeister*, 221 U.S. 603, 609 (1911) (subpoenas duces tecum); *Bethlehem Shipbuilding Corp. v. NLRB*, 120 F.2d 126, 127 (C. A. 1st Cir. 1941) (order that certain documents be produced for the purpose of pretrial discovery). In *Price v. Johnston, supra*, this Court held explicitly that the purpose and function of the All Writs Act to supply the courts with the instruments needed to perform their duty, as prescribed by the Congress and the Constitution, provided only that such instruments are "agreeable" to the usages and principles of law, extend to habeas corpus proceedings.

Thus, the Court has the inherent power to make such orders relating to discovery as are " 'agreeable' to the usages and principles of law…"  Since belated

disclosure of certain Brady material is tantamount to denial of Brady material, the Court has the authority to order its disclosure forthwith.

### D. DISCLOSURE IS FURTHER MANDATED BY RULE 16(a)(1)(C)

Much of the documentary information requested in this motion is discoverable pursuant to Rule 16(a)(1)(C), as being material to the preparation of the defendant's defense. The defense is informed and believes that at least one informant, possibly more, will be a prosecution witness in this case. That informant may have been a participant in the alleged wrongdoing charged in the indictment. This informant, it is believed, may have a criminal record and/or background, and may have a history of violence and substance abuse. It is imperative for the defense to be prepared for trial to have information concerning the circumstances and nature of this informant's and any other informant's relationship with state or federal agencies and officials.

Federal Rules of Criminal Procedure Rule 16(a)(1)(C) provides as follows:

> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Federal Rules of Criminal Procedure Rule 16(a)(1)(C) is implemented, in part, by Local Rule 16-1(c)(2) which reads as follows:

> **(c) Supplemental Disclosure.** In addition to the information required by FRCrimP 16, in order to expedite the trial of the case, in accordance with a schedule established by the parties at the conference held

pursuant to Crim. L.R. 16-1(a) or by the assigned Judge pursuant to Crim. L.R. 16-1(b), the government shall disclose the following: ...**(2) Informers.** A statement of the government's intent to use as a witness an informant, i.e., a person who has or will receive some benefit from assisting the government ...

## IV.  DISCLOSURE OF THE THUMB – DRIVE

On or about December 15, 2010, the government reported receiving from PayPal what purported to be "a USB thumb drive containing the top 1000 IP addresses which have been performing DDOS attacks on PayPal." (discovery, page Gen 000025)  The government then disclosed 26 pages of what is presumably a printout of data from this thumb drive.  (See discovery Gen 000025 – 000050)

From the discovery, it is clear that the printout is meant to show the IP address, the TP count, the date and time that the computer associated with the IP address first connected with PayPal servers, and the date and time that the computer was last connected with PayPal servers.

The problem is that, with the exception of 9 IP addresses spread over 26 pages, every other entry is either completely effaced with black marker, or is blank.

According to the Affidavit in Support of the Search Warrant authorizing the search of defendant Valenzuela's home, "The IP address 99.191.75.211 was identified by PayPal in the 1,000 IP addresses report as sending approximately 520 malicious network packets to PayPal between December 9, 2010 at 11:48 Pacific Standard Time (PST) and December 9, 2010 at 12:39 PST." (See Doc. 283, page 15) This IP address was later associated with defendant Valenzuela's home. (See Doc. 283, page 16)

This IP address, packet count, starting time and ending time correspond with the sole unredacted entry on Discovery 000045.

1
2
3
4

In reviewing the other 8 entries which were not wholly obliterated (as opposed to the 991 entries which were), one notes that IP address 98.210.80.194 is reported to have had first contact with PayPal on December 8, 2010 at 21:24:49 and terminated contact on December 9, 2010 at 09:31:45 (Discovery 000025)

5
6
7
8

That means that *before* Ms. Valenzuela allegedly sent her 520 packets to PayPal beginning on December 9, 2010 at 11:48 a.m., whoever was at IP address 98.210.80.194 had completed sending his or her 12,141 packets over 2 hours earlier and was never to be heard from again.

9
10
11
12
13
14
15

In a motion filed at the same time as this motion, defendant seeks an order requiring the government to present a Bill of Particulars explaining whether she is being prosecuted in Count 14 with aiding and abetting others, or with engaging in the charged conduct herself; she also asks for specificity with respect to the question of who the alleged co-conspirators were and with respect to what damage the government will seek to prove was inflicted on PayPal's computers and when that damage was inflicted.

16
17
18
19
20

Suffice it say at this point that the thumb drive is "material to the preparation of the defendant's defense" (Federal Rules of Criminal Procedure Rule 16(a)(1)(C)) on the question of conspiracy as alleged in Count 1, of aiding and abetting as alleged in Count 14, and on the question of relevant conduct in the event of a conviction.

21

## V.  CONCLUSION

22
23
24
25

Defendant Valenzuela is entitled to an order compelling the government to disclose any expert opinions it intends to offer at trial on the nature, structure, history or operations of Anonymous, the basis and reasons therefor, the data or other information relied upon in forming such opinions, including statements by

1   informers, and the qualifications of the witness.  The defendant is further

2   independently entitled to the identity of and statements of any informers who have

3   purported to offer statements about the nature, structure, history or operations of

4   Anonymous, or who participated or claim to have participated in any DDoS or chat

5   room or IRC in connection with or on behalf of "Anonymous."  Finally, defendant is

6   entitled to a copy of the thumb drive purporting to contain data on "the top 1000 IP

7   addresses which have been performing DDOS attacks on PayPal."

8   Dated:  December 4, 2012

9                                          Respectfully submitted,

10

11

12                                          James McNair Thompson

13                                          Attorney for defendant Tracy Ann Valenzuela

14

15

16

17

18

19

20

21

22

23

24

25